**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **HP/SUPERIOR, INC. and SUPERIOR** | ) | **JOINTLY ADMINISTERED** |
| **HEALTHCARE INVESTORS, INC.,** | ) | **CASE NO. 14-71797-PWB** |
| | ) | |
| Debtors. | ) | **JUDGE BONAPFEL** |

**MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE, OR IN THE**
**ALTERNATIVE, FOR CONVERSION TO CHAPTER 7**

COMES NOW CSE Mortgage LLC ("CSE"), a secured creditor and party in interest, and

moves the Court to appoint a Chapter 11 trustee for HP/Superior, Inc. ("HP/Superior") and

Superior Healthcare Investors, Inc. ("SHI"), pursuant to 11 U.S.C. § 1104(a), or in the

alternative, to convert this Chapter 11 case to a case under Chapter 7.

Submitted by:

*/s/ Kevin A. Stine*
Kevin A. Stine
Georgia Bar No. 682588
kstine@bakerdonelson.com

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.          Counsel for CSE Mortgage LLC
Suite 1600, Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, GA 30326
404.577.6000 (Telephone)
404.221.6501 (Facsimile)

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND .....................................................................................................3

    A.     Mittleider's Alter Ego Litigation...............................................................3

        1.     Mittleider, HP/Holdings, HP/Ancillaries, HP/Management Group,
             Prime Senior Services, and HP/Operations Group Are Alter Egos
             of HealthPrime. ...............................................................................3

        2.     HP/Management Services Is the Alter Ego of HealthPrime.......................4

    B.     Discovery Sanctions in Additional Alter Ego Litigation...............................5

    C.     Mittleider's Prior Diversion of Funds ....................................................10

    D.     The Ongoing Qui Tam Suit....................................................................11

    E.     Receiverships and Bankruptcies ............................................................13

        1.     Governor Winthrop Nursing Home and the Massachusetts Ban ..............13

        2.     The Mill River Foundation Bankruptcy....................................................16

        3.     The Salem-Tuskegee Receivership...........................................................19

        4.     The Salem-Reform Receivership...............................................................20

        5.     The Salem Housing Corporation Bankruptcies .........................................21

    F.     HP/Superior and SHI............................................................................24

        1.     HP/Superior's Pre-petition Breach of Lock Box Agreement ....................25

        2.     SHI's Control over HP/Superior Bank Accounts .......................................25

        3.     Amendment of Lease that Effectively Eliminates HP/Superior's
             Obligation to Pay Rent to SHI .......................................................27

        4.     Receivership Proceedings .........................................................................27

        5.     Failure to Pay Taxes Withheld From Employee Paychecks......................28

        6.     Pre-petition Transfers to Other Mittleider Entities and to Related
             Entities .........................................................................................29

7.   Post-Petition Transfers and Activities, as Established by the
Debtors' Own Operating Reports ...............................................................35

III.   LEGAL ARGUMENT ...............................................................................................42

A.   "Cause" Under § 1104(a)(1) and § 1112(b)(1), (b)(4) ...........................................43

1.   Pre-petition Conduct ....................................................................45

2.   Post-petition Conduct...................................................................45

3.   Causes of Action Current Management Are Unlikely to Pursue ..............46

B.   Interest of Creditors and Other Interests of the Estate Under § 1104(a)(2)
and § 1112(b)(1) ....................................................................................46

IV.   CONCLUSION ...................................................................................................47

## I.    INTRODUCTION

HP/Superior and SHI are owned and operated by Douglas K. Mittleider ("Mittleider"), either directly or through entities with whom he is affiliated ("Mittleider Entities").[1] Mittleider is the CEO, CFO, and secretary of both debtors; of HP/Superior's sole shareholder HP/Management Services, Inc.; of SHI's sole shareholder HP/HCC, Inc.; of HP/Superior's manager AltaCare Corporation ("AltaCare"); and of HP/Management Service's parent company HP/Holdings, Inc. Mittleider is also the sole shareholder of HP/HCC, Inc. and a 70% shareholder of HP/Holdings, Inc.[2]

Mittleider has a long history of siphoning assets from nursing home facilities operated by Mittleider Entities — both in bankruptcy and outside of bankruptcy.  He has a history of using the Mittleider Entities to assets. He has a history of ignoring or abusing discovery to avoid disclosing information about his web of entities. HP/Superior's own filings in this case establish improper pre-petition *and* post-petition payments to insiders and affiliates totaling *hundreds of thousands of dollars*.

Under 11 U.S.C. § 1104(a)(1), the Court *shall* order the appointment of a trustee for "cause," including pre-petition and post-petition "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." Id.  Cause exists to appoint a trustee here because of current management's pattern of improperly diverting assets to other Mittleider Entities. The HP/Superior estate has causes of action against current management and

---

[1]  Hereinafter, "Mittleider Entity" or "Mittleider Entities" will be used to refer to entities Mittleider directly or indirectly owns and controls. **Exhibit 1** of this motion is a list of 172 Mittleider Entities on file with the Georgia Secretary of State's Office, generated by a search of entities with an officer named "Mittleider." CSE's search generated 180 entity names — 172 Mittleider Entities; seven entities for which Mittleider's spouse Julie Mittleider is an officer; and one entity that appears to be unrelated. **Exhibit 1** contains only entities registered in Georgia.

[2] See Transcript of Hearing at 49:11-51:25.

1

other Mittleider Entities for preference avoidance and fraudulent transfer avoidance. A trustee will pursue these causes of action; current management will not sue itself for the benefit of the estate.

Additionally, under 11 U.S.C. § 1104(a)(2), the Court *shall* order the appointment of a trustee "if such appointment is in the interests of creditors … and other interests of the estate." Id.  Appointment of a trustee is in the best interests of CSE and other creditors of the debtors' estates because a trustee will pursue causes of action that current management will not pursue, including potentially claims by SHI against HP/Superior.  CSE has learned during the course of these bankruptcy cases that Mittleider caused HP/Superior to cease payment of rent to SHI as far back as January 2011, based on a purported amendment to the pre-petition lease — an unsigned, undated, and legally unenforceable amendment that violates CSE's loan documents.  As a result, HP/Superior owes SHI pre-petition rent and property taxes exceeding $2 million, as well as post-petition rent and taxes.  Indeed, HP/Superior has not paid a dime in rent or property taxes during the course of these bankruptcy cases, even while engaging in post-petition transfers of assets to Mittleider Entities.

Finally, under 11 U.S.C. § 1112(b)(1), the Court *shall* convert a Chapter 11 case to a Chapter 7 case "for cause" if conversion, rather than appointment of a Chapter 11 trustee, "is in the best interests of creditors and the estate." Id. CSE submits that the same cause justifying appointment of a Chapter 11 trustee justifies conversion of the case to Chapter 7.

## II.    BACKGROUND

### A.    Mittleider's Alter Ego Litigation

At least twice, a court has determined Mittleider or a Mittleider Entity is an alter ego of another Mittleider Entity.[3]  These cases are discussed below.

#### 1.    Mittleider, HP/Holdings, HP/Ancillaries, HP/Management Group, Prime Senior Services, and HP/Operations Group Are Alter Egos of HealthPrime.

In Netbank, Inc., v. HealthPrime, Inc., Case No. 2003-DD-001039 (St. Ct. Fulton Co.) (the "Leasing Suit"), the landlord plaintiff sued to collect rent from and evict Mittleider Entity HealthPrime, Inc. ("HealthPrime").  HealthPrime did not answer, resulting in a default judgment of $125,714.00.

In a subsequent suit, the same plaintiff sought to hold Mittleider and certain other Mittleider Entities (including HP/Holdings) liable for HealthPrime's debt as alter egos of HealthPrime.[4]  See Netbank, Inc. v. Mittleider et al., Case No. 2004-CV-83820, (Sup. Ct. Fulton Co.) (the "Veil-Piercing Suit").  The defendants defaulted, and the superior court entered a judgment against Mittleider, HP/Holdings, and the other named Mittleider Entities for $438,264.15. A copy of this judgment is attached to this motion as **Exhibit 2**.

Mittleider then sued his attorney from the Leasing Suit and the Veil-Piercing Suit for malpractice. See Mittleider et al. v. M. Henry Day, Jr., P.C., and M. Henry Day, Jr., Case No. 2007-EV-001830 (St. Ct. of Fulton Co. 2007) (the "Malpractice Suit").[5] The Malpractice Suit

---

[3] There is such an abundance of litigation around the country involving Mittleider and various Mittleider Entities, CSE has not investigated every legal proceeding.  The proceedings discussed here represent only a subset of proceedings involving Mittleider.

[4] According to Mittleider, HP/Holdings is the parent company of HP/Management Services which, in turn, is the parent company of HP/Superior.

[5] A copy of Mittleider's complaint from the Malpractice Suit is attached as **Exhibit 3.**

was dismissed, *with prejudice*, as a discovery sanction against Mittleider.  He refused to divulge (among other things) basic information about intercompany transfers among Mittleider Entities. A copy of that dismissal order is attached as **Exhibit 4** and states, in relevant part:

> This Court finds that **[the Mittleider] Plaintiffs have willfully failed to comply with the prior discovery order and have abused the discovery process**, causing unnecessary delay and expense for Defendants.
>
> \* \* \* \* \* \* \* \* \* \*
>
> Generally, Plaintiffs were ordered to respond to interrogatories concerning: (a) monetary transfers among the Plaintiffs; (b) legal work Day allegedly performed for each Plaintiff; and (c) each Plaintiff's alleged damages.
>
> \* \* \* \* \* \* \* \* \* \*
>
> While Plaintiffs apparently maintain that each corporate entity is separate and independent, they make no effort whatsoever to distinguish between themselves as it relates to damages nor, more importantly for the purposes of this Order, do they make any valid attempt to provide the individualized discovery responses that the prior Order clearly and specifically requires.
>
> \* \* \* \* \* \* \* \* \* \*
>
> This Court recognizes that dismissal is a harsh sanction. However in light of the fact that even after the Court expressed dismay at Plaintiffs' discovery responses, they did not offer to supplement their responses or offer any reasonable explanation for the unresponsive discovery responses, the Court finds that it is an appropriate sanction. After careful consideration of the pleadings and the oral arguments of counsel, this Court finds that **Plaintiffs have willfully refused to comply with the February 28, 2008 Order and have acted in bad faith, causing unnecessary delay of the discovery process and expense for Defendants**.

Id. (emphasis added).

## 2.    HP/Management Services Is the Alter Ego of HealthPrime.

Mittleider's similar discovery abuse in North Carolina resulted in a trial court's order declaring three Mittleider Entities (including HP/Superior's parent HP/Management Services) "are all mere instrumentalities and/or alter egos of HealthPrime." Excel Staffing Service, Inc. v. HP/Reidsville, Inc. et al., 172 N.C. App. 281, 286 (2005) (copy attached as **Exhibit 5**).  The appellate court affirmed the trial court's ruling on appeal. See id. at 287-88.

4

**B.**    **Discovery Sanctions in Additional Alter Ego Litigation**

In Continental Casualty Co. v. HealthPrime, Inc., et al.,  Case No. 07-02512 (N.D. Ga. 2007) (Martin, J., reassigned to Duffey, J., on Jan. 25, 2010), the plaintiff sought to pierce the corporate veil and assert alter ego liability against Mittleider, AltaCare, and several other Mittleider Entities.   In an Order entered on June 18, 2009 [Dkt. No. 88], Judge Martin commented on Mittleider's reputation in this jurisdiction:

> Essentially, Plaintiffs allege that Mr. Mittleider has created a web of related companies in order to render any of those companies judgment proof, while permitting others to enjoy goods and services without paying for them.
> \* \* \* \* \* \* \* \* \* \*
> At the outset, it should be said that the claims asserted by Plaintiffs here are not unfamiliar to the court where Healthprime, Mr. Mittleider and his companies are concerned. In a variety of suits ranging from breach of contract to employment disputes, courts have consistently noted the convoluted web of companies created by Mr. Mittleider and the resulting difficulty in assigning liability. This difficulty has been attributed both to the abstruse business relationship among the companies, and also to counsel's litigation strategy in failing to cooperate in the discovery process.
>
> Numerous courts have noted the blurry division among Mr. Mittleider's companies. See e.g., Davis v. AltaCare Corp., 291 F. App'x 645, 646-47 (5th Cir. 2008); Excel Staffing Serv. Inc. v. HP/Reidsville, Inc., 616 S.E.2d 349, 353 (N.C. App. 2005). In at least one case, a trial court granted summary judgment in favor of a plaintiff's claim that some of the related companies were "all mere instrumentalities and/or alter egos of HealthPrime," and therefore liable for its breach. See Excel Staffing Serv., 616 S.E.2d at 353. Another court took judicial notice of the fact that companies controlled by Mr. Mittleider have repeatedly refused to cooperate with reasonable discovery requests. Pharmerica, Inc. v. HealthPrime, Inc., No. 1:07-cv- 0207-JEC, 2008 WL 779329, at \*2-\*3 (N.D. Ga. Mar. 19, 2008) (Carnes, J.). In Pharmerica, Inc. v. Direct Care Services, No. 1:05-cv-3105 (N.D. Ga. Jan. 30, 2007) (Martin, J.), the undersigned entered a judgment against certain companies run by Mr. Mittleider.[6] When the plaintiffs had difficulty locating defendants' assets to satisfy this judgment, a motion to compel discovery responses was granted in light of Mr. Mittleider's failure to cooperate. In Pharmerica, Inc. v. HealthPrime, Inc., the plaintiff argued that discovery issues there, and in previous cases, were not a matter of coincidence. Rather, plaintiff alleged that "Mr. Doug Mittleider has, and continues to, fraudulently avoid paying

---

6 This judgment is in the amount of $356,419.05 as to one defendant and $191,241.45 as to the other defendant. See Amended Judgment [Dkt. No. 42].

5

creditors by creating a labyrinth of entities designed to be maddeningly hard to follow, in order to (a) keep his companies judgment proof, and (b) hide his money for his own personal benefit." Pharmerica, Inc., 2008 WL 779329, at *2.

Of course, this case will be decided on the merits of its own record. However, **it is almost impossible to be a part of this court and not know of HealthPrime and counsel's repeated litigation tactics. These tactics include refusing to comply with discovery requests that would shed light on business relationships, and also using multiple corporate entities to obfuscate proper allocation of financial responsibility.**

Id. (emphasis added) (copy of Order attached as **Exhibit 6**).[7]

The Continental Casualty case later settled. The Mittleider defendants agreed to pay an undisclosed sum, and the parties agreed to an escrowed consent judgment for the sum of $2,250,000.

On May 11, 2015, Continental Casualty Company filed another lawsuit against the same defendants, alleging breach of the settlement that ended the previous lawsuit. See Continental Casualty Co. v. Healthprime, Inc., et al., Case No. 15-01656 (N.D. Ga. May 11, 2015) (Duffey, J.). Among the allegations are that the Mittleider defendants paid $1,063,333 under the settlement but failed to pay the remaining $1,186,667.

In PharMerica, Inc. v. HealthPrime, Inc., Case No. 07-0207-JEC (N.D. Ga.) (Carnes, J.), a pharmacy services provider sought to pierce the corporate veil and assert alter ego liability against Mittleider, AltaCare, HP/Holdings, Inc., and several other Mittleider Entities for breach of contract and unjust enrichment. Mittleider and the related defendants refused to comply with the plaintiff's discovery requests. Judge Carnes issued a lengthy Order and Opinion [Dkt. No. 63] explaining the numerous deficiencies in their discovery responses and explicitly finding bad faith:

---

[7] Judge Martin noted "at least one" instance of alter ego liability. She may have been unaware of at least one other instance—the Veil-Piercing Suit and related litigation.

Plaintiff alleges that these failures are not a result of inadvertence, but rather evidence of bad faith. Plaintiff points to another case involving plaintiff and another company owned by Doug Mittleider, in which Mr. Mittleider's company also failed to cooperate with discovery requests. (See PharMerica, Inc . v . Direct Care Services d/b/a Buckhead Health and Rehab and HCC - Healthcare of Marietta, LLC d/b/a Shoreham at Marietta, Case No. 1:05-CV-3105-BBM, attached to Motion to Take Judicial Notice [61].) In that case, Judge Beverly Martin granted plaintiff's Motion to Compel and ordered defendant to comply with plaintiff's discovery requests. However, according to plaintiff, Mr. Mittleider's company settled, rather than providing the required information. Plaintiff argues that the discovery problems here and in the prior case are not a matter of coincidence. Plaintiff claims that 'Mr. Doug Mittleider has, and continues to, fraudulently avoid paying creditors . . . by creating a labyrinth of entities designed to be maddeningly hard to follow[,] in order to (a) keep his companies judgment proof[,] and (b) hide money for his own personal benefit.'

In response to defendants' failure to comply with discovery requests here, plaintiff brought this Motion to Compel, a Motion for Hearing on Plaintiff's Motion to Compel, and a Motion to Take Judicial Notice of the prior action discussed above.

\* \* \* \* \* \* \* \* \* \*

The prior case not only serves as notice to the Court of Mr. Mittleider's company's prior conduct, it also served as notice to him of the types of documents and information that are required in lawsuits. Therefore, any failure to proffer those documents and information in this case is inexcusable. The Court is therefore unsympathetic to defendants' refusal to produce documents or fully comply with discovery requests here. In short, the Court GRANTS plaintiff's motion for judicial notice of the prior litigation.

\* \* \* \* \* \* \* \* \* \*

 [T]he deficiencies in defendants' responses are obvious. Defendants here have clearly and blatantly failed to meet their discovery obligations.

\* \* \* \* \* \* \* \* \* \*

Defendant's refusal to provide bank account information and financial statements, which are standard discovery requests, reveals defendant's bad faith.  In addition, if the company can keep track of the bank accounts for business purposes, it can certainly list them for plaintiff without being unduly burdened. There is no excuse for failing to respond to this request.

\* \* \* \* \* \* \* \* \* \*

**The recalcitrance, gamesmanship, and bad faith of HealthPrime, HCC, and Hanover have caused unnecessary expense for plaintiff and unnecessary work for this Court.** Given defendants' misconduct, they shall note that this Order is not limited to the production requests specifically addressed by the Court.

\* \* \* \* \* \* \* \* \* \*

**According to plaintiff, defendants' actions alone suggest bad faith and dilatory tactics. The Court agrees.** In light of defendants' failure to provide complete responses and defendant's overall refusal to cooperate with plaintiff's

discovery requests, this Court grants plaintiff's request for reimbursement for the costs of filing this motion and any related filings and proceedings. Defendants have been responsible for the submission of many unresponsive and perhaps misleading documents and answers. This has placed an unacceptable burden on both plaintiff and this Court. Further, defendants were advised in the previous action before Judge Martin that resistance to a discovery requests may be met with sanctions and reimbursement.

Id. at 4-5, 6, 7-8, 18-19, 24, 25-26 (emphasis added) (copy attached as **Exhibit  7**).[8]

In RehabCare Group East, Inc., v. HCC-Healthcare of Birmingham, LLC, Case No. 09-01675-RWS (N.D. Ga.), the plaintiff asserted claims for breach of contract, unjust enrichment, and breach of fiduciary duty and sought alter ego liability against Mittleider, his wife Julie Mittleider, AltaCare, HP/Superior, and several other Mittleider Entities. The matter settled for $200,000 and an escrowed consent judgment of $422,007.56.  The Mittleider defendants defaulted, resulting in entry of a consent judgment in February 2012.  See Dkt. Nos. 104 and 105 (copies attached as **Exhibit 8**).[9]

Thereafter, the RehabCare Group record reflects a heated post-judgment discovery battle,[10] which the plaintiff won on every issue.[11] Notably, Mittleider admitted in a post-judgment deposition that (i) he transferred his one-half ownership of his marital residence to his

---

[8] The Westlaw citation is: PharMerica, Inc. v. HealthPrime, Inc., No. CIV.A.1:07CV0207JEC, 2008 WL 779329 (N.D. Ga. Mar. 19, 2008).

[9] Julie Mittleider, although a defendant in the action, was not a liable party under the Agreed Judgment.

[10] See Defendants' and Non-parties' Motion to Quash [Dkt. No. 115]; Plaintiff's Memorandum in Opposition to Motion to Quash [Dkt. No. 117]; Plaintiff's Motion to Compel Deposition Testimony and for Sanctions [Dkt. No. 118]; Julie Mittleider's Response in Opposition to Motion to Compel Testimony and For Sanctions and Motion for Protective Order [Dkt. Nos. 133, 134]; Plaintiff's Reply in Further Support of Motion to Compel Deposition Testimony and Sanctions; Julie Mittleider's Reply in Supporter of Motion for Protective Order [Dkt. No. 142].

[11] See Order [Dkt. No. 141]; Order [Dkt. No. 143].

wife, (ii) he routinely transfers his paychecks to his wife, who then deposits the checks in her personal banking account, and (iii) he does not know the name of his wife's bank.

Julie Mittleider then refused to answer deposition questions about the transfers she received from Mittleider. On March 8, 2013, Judge Story entered an order granting the plaintiff's motion to compel and denying Julie Mittleider's motion for protective order [Dkt. No. 143], explaining as follows:

> On February 23, 2012, this Court entered a Judgment against all Defendants except Mrs. Mittleider in the amount of $436,219.30 plus interest subject to certain deductions. In order to discover assets that could be used to pay the Judgment, Plaintiff took a post-judgment deposition of Mr. Mittleider in which he testified concerning assets that he transferred to his wife. Specifically, he testified that he routinely gives his pay checks to Mrs. Mittleider and she deposits those checks into her personal bank account. Mr. Mittleider also testified concerning items of personal property purchased by Mrs. Mittleider with funds from her personal account.
>
> \* \* \* \* \* \* \* \* \* \*
>
> The Court finds that Mrs. Mittleider's objections to the questions posed by Plaintiff's counsel were not justified. Mr. Mittleider had testified that he routinely gave his checks to Mrs. Mittleider for deposit into her accounts. Plaintiff has a right to try to trace those funds to assets that might be used to satisfy its Judgment. It is unreasonable to believe that a judgment debtor would be allowed to funnel his assets into a source, and that that source would then be protected from disclosing information about the use of those assets. Thus, the Court concludes that Plaintiff is entitled to the relief it seeks.

Id. (copy attached as **Exhibit 9**).

In Trilogy Rehab Services v. HP/Markleysburg, Inc., et al., No. 11-02105-TCB (N.D. Ga.), a therapy services provider sued Mittleider, Julie Mittleider, AltaCare, and several other Mittleider Entities for breach of contract and once again alleged veil piercing. This also reflects discovery battles in which the Mittleider defendants appear to have lost on every issue.[12]

---

[12] See Defendants' Motion to Quash [Dkt. No. 94]; Julie Mittleider's Motion to Quash [Dkt. No. 96]; Plaintiff's Motion to Compel Discovery Responses [Dkt. No. 97]; Plaintiff's Memorandum in Opposition to Defendants' Motion to Quash [Dkt. No. 98]; Plaintiff's Memorandum in Opposition to Julie Mittleider's Motion to Quash [Dkt. No. 99]; Defendants' Response Brief in

C.      **Mittleider's Prior Diversion of Funds**

In Yeo & Yeo, P.C. as Receiver for the Malachi Corp. v. HP/Management Group, Inc., Case No. 03-40340 (E.D. Mich.),[13] a district court found Mittleider Entity HP/Management Group, Inc. had wrongfully diverted *nearly $3 million* of funds belonging to several receivership estates. HP/Management Group, Inc. had served as court-appointed manager of seven skilled nursing facilities.[14] In the Order Granting Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 85], the district court noted that HP/Management Group "concede[d] that it diverted $1,851,468 from some receivership estates to other receivership estates." Id. (copy attached as **Exhibit 10**). The court found the asserted justifications "meritless," noting, "[n]owhere in the Management Agreements is Manager HP authorized to commingle monies from the different bank accounts and to use monies from one facility to support another different facility." Id.

Later in the Malachi Corp. case, the district court entered judgment against HP/Management Group for $2,762.791.00. See Dkt. No. 126 (copy attached as **Exhibit 11**). In the related summary judgment order [Dkt. No. 108], the district court held "HP operated all seven facilities as a single concern, often diverting funds from the estates that were showing a profit in order to shore up others of the homes that were unprofitable." Id. (copy attached as **Exhibit 12**).

---

Opposition to Motion to Compel Discovery Responses [Dkt. No. 104]; Reply Brief in Support of Defendants' Motion to Quash [Dkt. No. 107]; Plaintiffs' Reply Memorandum in Further Support of Motion to Compel Discovery Responses [Dkt. No. 108]; Order [Dkt. No. 135] (denying motions to quash); Order [Dkt. No. 138] (granting motion to compel).

[13] Wells Fargo Bank Wisconsin, N.A. was the original plaintiff in this case.

[14] The related receivership proceeding is Norwest Bank Minnesota, N.A., v. Malachi Corp., Case No. 99-40146 (E.D. Mich.).

In <u>Yeo & Yeo, P.C. as Receiver for the Malachi Corp. v. HealthLink Services, LLC</u>, Case No. 07-10087 (E.D. Mich.),[15] the plaintiff sued Mittleider and five Mittleider Entities for conspiracy to breach fiduciary duties and for conversion.  Where the previous litigation against HP/Management Group involved diversion of funds among non-Mittleider Entities in receivership, this litigation involved diversion of funds *away from* those receivership estates and *to* the defendant Mittleider Entities.   The matter settled with Mittleider agreeing to pay $1,035,000 and agreeing to guaranty an additional $1,035,000 owed by a co-defendant. <u>See</u> Plaintiff's Motion for Entry of Judgment Against the Mittleider Defendants [Dkt. No. 72] and Exhibit B thereto [Dkt. No. 72-2], copies attached as **Exhibit 13** of this motion.

### D.    The Ongoing Qui Tam Suit

Mittleider, Julie Mittleider, AltaCare, and several other Mittleider Entities are defendants in an ongoing qui tam action brought by relator Academy Health Center, Inc., the lessor of a building where Mittleider Entity Hyperion Foundation, Inc., operated a skilled nursing facility. <u>See</u> <u>U.S. ex rel. Acad. Health Ctr., Inc. v. Hyperion Found., Inc.</u>, Case No. 10-00552 (S.D. Miss.).  The United States government has intervened in the portion of the qui tam complaint alleging Mittleider submitted, or caused to submit, *false Medicare and Medicaid claims* for nursing services. <u>See</u> United States' Complaint in Intervention [Dkt. No. 37].

A summary of the allegations against the Mittleider defendants in this qui tam action is found in <u>U.S. ex rel. Acad. Health Ctr., Inc. v. Hyperion Found., Inc.</u>, Case No. 3:10-CV-552-CWR-LRA, 2014 WL 3385189 (S.D. Miss. July 9, 2014) (copy attached as **Exhibit 14**).  Among the highlights:

- "… Douglas Mittleider, Julie Mittleider and the Mittleider companies have developed a nationwide scheme intended to defraud Medicare and Medicaid programs, and that

---

[15] Again, Wells Fargo Bank Wisconsin, N.A. was the original plaintiff.  This litigation arose out of the same receivership as did the litigation against HP/Management Group.

Douglas Mittleider has formed a 'web' of more than 150 companies, including but not limited to the companies subject to this action, in an effort to defraud Medicare, Medicaid, and the companies' creditors. Defendant AltaCare Corporation manages and/or operates at least 34 long-term care homes throughout the United States." Id. at *11.

- Mittleider, his wife, and his entities use "at least three scams as part of their scheme to defraud the Government, creditors, and residents." Id.

- One scheme involves Mittleider defrauding skilled nursing facilities. Mittleider or a Mittleider Entity will contract with skilled nursing facilities to manage and/or operate the facility. Then, "the Mittleider entity will contract with one or more different Mittleider companies for a variety of management services. … Douglas Mittleider and/or Julie Mittleider give preference to Mittleider companies, which may or may not be providing services to the facility, and funnel Medicare and Medicaid funds intended for resident care to those companies to the detriment of the facilities." Id.

- Another scheme involves leasing nursing home facilities from the owners of those facilities, then failing to pay rent. "The Mittleider entity fails to make the agreed-upon rent payments, prompting the lessor to initiate costly litigation. The Mittleider entity, at the direction and control of Douglas Mittleider, Julie Mittleider, the Mittleider companies, and/or John Does 1– 200 will 'vexatiously draw out litigation, eventually forcing settlement for a lesser amount than what is owed.'" Id.

- The final scheme involves contracting with vendors of healthcare items or services, submitting claims to Medicare and/or Medicaid for the costs of the services/items, and refusing to remit the funds to the vendors. Mittleider draws out the subsequent litigation, eventually entering a confidential settlement for a mere portion of the amounts owed to the vendors. Id. at * 12.

To put it mildly, Mittleider's use of the funds did not appear to benefit the Hyperion residents.  Here are but a few of the squalid conditions the Hyperion residents lived under, as noted in several surveys conducted by the Mississippi State Department of Health:

- The facility had no shower curtains or screens to give showering residents privacy. Staff members made the female residents shower in groups. "The women surveyed stated that 'they did not want to be nude in front of others and did not want to see others nude.'" Id. at *3.

- The residents were risk of harm "from snakes, rats, insects, and other vermin" due to lack of maintenance and housekeeping. In one example, a snake was found in a bed-ridden resident's bed, discovered only after a staff member investigated the resident's complaint of leg pain. That resident's bathroom walls were eroded, containing numerous holes. In another instance, staff members discovered a snake in the sitting area of the facility. In yet another instance, a poisonous water moccasin was found under the bushes just outside

the facility. One resident recounted a story of how she watched the ants and spiders on the walls and window in her room. Other residents saw mice in their rooms.  Id. at *4.

• The residents were inadequately supervised. One resident left the facility without staff knowledge and was returned only after a passerby informed the staff that the resident was wandering 0.6 miles down Highway 11. Eleven of twelve patients complained of not having enough to eat. In more than one survey, "there were strong odors of urine, loose baseboards, loose air vents, and peeling paint." Id. at *5.

• One patient was given such poor care that upon transfer to a different local nursing facility, and the new facility had to immediately scrub the patient clean. A different patient was transferred because of unhealed bed sores and wounds caused by lack of nutrition. Id. at *6.

• A security system was stripped from the facility wall in an apparent repossession, leaving a large unrepaired hole. Id.

The United States' complaint in intervention alleges that the defendants submitted, or caused to submit, false Medicare and Medicaid claims for services that "were in fact non-existent, grossly deficient, materially substandard and/or worthless." Id. at *15.  On information and belief, the pretrial discovery process is ongoing in the qui tam action.[16]

E.    **Receiverships and Bankruptcies**

1.    **Governor Winthrop Nursing Home and the Massachusetts Ban**

Mittleider is currently banned from operating nursing homes in Massachusetts. The Massachusetts Department of Public Health (the "DPH") had given several chances to cure numerous deficiencies in the quality of care of the residents at Governor Winthrop Nursing Home.  When Mittleider failed to cure the deficiencies, the DPH filed a complaint against Mittleider and several Mittleider Entities to appoint a receiver over the Governor Winthrop

---

[16] The Court should recall in prior hearings the debtors' counsel complained that CSE's efforts to conduct Rule 2004 examinations of HP/Superior and related Mittleider Entities was an unnecessary distraction from the debtors' efforts to negotiate and consummate a sale of their assets.  The debtors' counsel did not inform the Court, however, that Mittleider is a party to pending litigation in other jurisdictions and has been devoting time to discovery in those other proceedings.

Nursing Home. The trial court put the facility into a temporary receivership and quickly closed

the nursing home on the receiver's motion, based on the following findings:

- Mittleider "had ultimate authority over all financial decisions" as president of the home's manager, AltaCare.

- "AltaCare and other Winthrop affiliates controlled almost all of Winthrop's funds."

- "The Facility's Medicaid and Medicare and other funds were deposited electronically into an account that was not controlled by the Facility administrator or staff."

- "Winthrop's central corporate office or its affiliates paid the Facility's bills through a centralized payables system."

- Facility administrator Kevin Cogan—newly appointed after the DPH issued the a report detailing the facility deficiencies—prepared a plan to correct the deficiencies and made "repeated requests" to Mittleider for cash and resources to address the deficiencies and pay bills.

- "Despite being aware of the deficiencies, the corporate officers of Winthrop and its affiliates failed to provide the resources needed …." The two times Mittleider and/or corporate officers sent checks to help pay for repairs, the checks were returned for insufficient funds.

- "Because of this mismanagement and financial abandonment, … the Facility was in an emergency situation." Contributing to the emergency were a shortage of staff and management, the electric company threatening to terminate service, vendor contracts expiring without ability to renew because of nonpayment, only one working shower for sixty residents, ignored requests for additional funds, inability to ensure resident safety, and the newly appointed administrator's resignation.

- The eventual receiver "was denied more than $230,000 in Medicare and Medicaid funds, which were deposited into a Winthrop bank account in Georgia controlled by the defendants …."

- The receiver did not have funds to cure the numerous deficiencies, resulting in termination from Medicaid and Medicare programs, leaving the facility economically unviable.

See Findings of Fact, Rulings of Law, and Order for Judgment on the Receiver's Emergency

Motion for Authorization to Close the  Governor Winthrop Nursing Home, No. 06-5340 (Suffolk

Sup. Ct. Feb. 7, 2007) (copy attached as **Exhibit 15**).

Mere days before the Massachusetts court entered that order, Mittleider caused the nursing home to file a Chapter 11 case in the Northern District of Georgia, see *In re* Winthrop Healthcare Investors, L.P., Case No. 07-61115-crm (Bankr. N.D. Ga. Jan. 25, 2007), with an Emergency Motion Confirming Applicability of the Automatic Stay to Massachusetts Receivership Action [Dkt. No. 7] and a Motion to Impose Stay [Dkt. No. 9]. Judge Mullins ruled that the receivership action was subject to the police power and regulatory action exception to the automatic stay and denied the motions. See Dkt. Nos. 32, 37.

The DPH subsequently initiated an action to revoke the receivership defendants' licenses to operate nursing homes and to seek a determination that they are not suitable or responsible to maintain or establish a long-term care facility. Dep't Public Health v. Winthrop Healthcare Investors, LP, No. PH-07-319, 2007 DALA LEXIS 311, at *1 (Mass. Div. Admin. Law Appeals Oct. 18, 2007), a copy of which is attached as **Exhibit 16**. In apparent attempt to moot the action and avoid an adverse ruling, Mittleider and the remaining defendants surrendered their licenses and then moved to dismiss for lack of jurisdiction. See id. at *13-14.  The judge denied the motion to dismiss and entered an order finding that Mittleider and the named Mittleider Entities "are determined unsuitable and not responsible to establish or maintain a long-term care facility." Id. at *17. This order details at length the list of appalling deficiencies and conditions resulting from mismanagement of the facility. See id. at *2-13.

Mittleider later agreed to a 10-year ban from operating long-term care facilities in Massachusetts and a consent judgment in the amount of $359,379. **Exhibit 17** of this motion is a copy of the Final Judgment by Consent entered in the Suffolk County Superior Court imposing the ban and judgment.

Mittleider then sued Kevin Cogan — the Winthrop administrator appointed three months before the receivership action was filed and after the DPH had already issued a report of numerous deficiencies — alleging that the losses from the closure of the nursing facility were caused by Cogan's mismanagement. The court concluded that the lawsuit was "wholly insubstantial, frivolous and not advanced in good faith," awarding attorney fees to Cogan after the Mittleider plaintiff attempted to voluntarily dismiss. Winthrop Healthcare Investors, L.P. v. Cogan, 2010 Mass. Super. LEXIS 342, at *8 (Mass. Super. Ct. 2010). The court explained the frivolous lawsuit as follows:

> It is clear that the plaintiffs filed this action intending to retaliate against Cogan for his reporting to the DPH, the Attorney General, and the Superior Court about the deplorable, unsafe, and illegal activities and conditions at Governor Winthrop. After examining the record in the case against Governor Winthrop, the court cannot imagine that any reasonable person would believe the plaintiffs' claims against Cogan were valid or made in good faith. In fact, the plaintiffs' quick filing of a Notice of Dismissal after the September 22, 2010 hearing casts further doubt on the plaintiffs' good faith as it was an obvious attempt to avoid attorneys fees and costs under the anti-SLAPP statute. In the present situation, where the plaintiffs, frivolously and in bad faith, filed a complaint and then opposed Cogan's anti-SLAPP motion, the court finds that justice requires an award of attorneys fees and costs for Cogan's defense of the action.

Id.

## 2.    The Mill River Foundation Bankruptcy

Mittleider Entity Mill River Foundation, Inc., a Connecticut skilled nursing facility doing business as William and Sally Tandet Center for Continuing Care ("Mill River"), filed a Chapter 11 bankruptcy case in the District of Connecticut on February 21, 2012. See Mill River Foundation, Inc., Case No. 12-50306 (Bankr. D. Conn.). AltaCare managed Mill River, similar to HP/Superior.

The poor conditions and subsequent closing of Mill River appear to have been a catalyst to the Connecticut General Assembly's introduction of a bill that, if passed, would have held

16

nursing home licensees and owners criminally liable for abuse or neglect of nursing home

residents. A Connecticut General Assembly Aging Committee Joint Favorable Report[17] on the

bill quoted Connecticut's Long Term Care Ombudsman as follows:

> In 2012, the State of Connecticut experienced the closing of yet another
> Connecticut nursing home in financial distress. The State incurred the costs of the
> receivership of this home. The staff endured many months prior to the
> receivership of not having health care premiums paid by the owner and not
> knowing whether there would be proper and adequate food and supplies to care
> for their residents. Vendors were not making deliveries because of outstanding
> bills. The residents and their families were significantly impacted by the
> emotional costs of the uncertainties surrounding the home's financial instability as
> well as the adverse effects on their care and services. **The owner of this home,
> Douglas Mittleider, in fact was previously prohibited in 2009 from doing
> business in Massachusetts for the next ten years … The residents were left at
> significant risk due to staff shortages, incidents of patient abuse and neglect,
> safety code violations and broken equipment. And then Mr. Mittleider
> moved his business to Connecticut with his purchase of the William and Sally
> Tandet nursing home in Stamford. The State of Connecticut has a
> responsibility to ensure to the best of its ability that unscrupulous nursing
> home providers are not allowed to do business in Connecticut.** It is a cost to
> the State, its business community and the frail and vulnerable individuals charged
> to our care.

Id. (emphasis added) (copy attached as **Exhibit 18**).

In Mill River's bankruptcy case, the Official Committee of Unsecured Creditors filed a

Motion for the Appointment of a Chapter 11 Trustee [Dkt. No. 133] alleging, among other things

that: (1) in the year before filing, Mill River transferred over $7.9 million to AltaCare and

Mittleider Entity Long Term Care Services, Inc. ("LTCS")[18], without providing a meaningful

accounting; (2) Mittleider caused the commingling of funds among Mill River, AltaCare, and

---

[17] See http://www.cga.ct.gov/2013/JFR/H/2013HB-05761-R00AGE-JFR.htm for a copy of the
Joint Favorable Report.

[18] LTCS is among the Mittleider Entities that received pre-petition transfers from HP/Superior,
as reflected in the schedules. During the initial meeting of creditors in HP/Superior's case,
Mittleider testified the pre-petition payments from HP/Superior's operating account to various
Mittleider Entities were likely repayment of advances from those Mittleider Entities although the
purported loans are not documented.

LTCS; (3) Mill River made an unauthorized $50,000.00 post-petition transfer to LTCS; (4) Mill River failed to provide a detailed accounting of intercompany transfers despite repeated requests; (5) Mill River failed to disclose several bank accounts; (6) Mill River did not disclose, during a four-hour meeting a creditors, that most of the management services to be provided by AltaCare would be subcontracted to Five Rivers Management, LLC, an entity not certified to provide nursing home management services in Connecticut; and (7) Mill River was not paying employee health insurance claims. The IRS joined that motion due to Mill River's failure to remit nearly $3.6 million in pre- and post-petition federal withholding taxes.[19]

On May 11, 2012, the bankruptcy court in Mill River entered an Order Directing Appointment of Chapter 11 Trustee [Dkt. No. 156].  Two weeks later, the trustee moved to abandon the nursing facility because the debtor lacked funds to make payroll or fund other expenses coming due.[20] On May 31, 2012, the bankruptcy court approved the abandonment to a state court-appointed receiver.

On June 12, 2012, the Chapter 11 trustee moved to convert Mill River to a Chapter 7. See Dkt. No. 208. The trustee explained that Mill River's former management torpedoed any prospect of rehabilitation by: (1) grossly mismanaging the estate, including failing to pay health insurance premiums for employees, failing to maintain workers' compensation insurance, transferring funds to affiliates without a proper accounting, failing to pay substantial withholding taxes to the IRS, and failing to pay numerous post-petition administrative creditors; and (2) making unauthorized transfers to LTCS and AltaCare. The bankruptcy court converted the case on July 11, 2012. See Dkt. No. 228.

---

[19] See United States of America's Joinder to the Committee's Motion for Appointment of a Chapter 11 Trustee [Dkt. No. 138].

[20] See Chapter 11 Trustee's Motion to Abandon Property of the Debtor's Estate [Dkt. No. 181].

Three Mittleider Entities, Cambridge House, LTCS, and Timberlake Nursing Center, were later sued by the Chapter 7 trustee. That litigation settled in 2014 for cash payments totaling over $311,615.[21] Mittleider signed the settlement agreements. As noted later, HP/Superior made substantial payments to both Cambridge House and LTCS in the year before HP/Superior filed this case.

### 3.    The Salem-Tuskegee Receivership

On January 15, 2014, the Centers for Medicare and Medicaid Services and the Alabama Medicaid Agency terminated the Medicare and Medicaid provider agreements with Mittleider Entity Salem Nursing & Rehab Center of Tuskegee, Inc. ("Salem-Tuskegee"), another entity managed by AltaCare. The Bank of New York Mellon, as indenture trustee, sought appointment of a receiver and sued Salem-Tuskegee and AltaCare for damages for breach of several agreements, for injunctive relief, and for an accounting. See Bank of New York Mellon Trust Company, N.A., as Indenture Trustee v. Medical Clinic Board of Tuskegee, Alabama, Salem Nursing & Rehab Center of Tuskegee, Inc., and AltaCare Corporation., Case No 14-00059 (M.D. Ala.). The plaintiff noted that state agencies had begun transferring residents to other nursing homes because Salem-Tuskegee was no longer eligible to provide services to Medicare and Medicaid recipients.[22] The district court entered an Order Appointing Receiver on March 14, 2014 [Dkt. No. 46].

---

[21] See Order Granting Motion to Compromise [Dkt. No. 414]; Order Granting Motion to Compromise [Dkt. No. 418]; Order Granting Motion to Compromise [Dkt. No. 419]; Settlement Agreement [Dkt. No. 421]; Settlement Agreement [Dkt. No. 422]; Settlement Agreement [Dkt. No. 423]; Cyganowski v. Cambridge House (In re Mill River Foundation, Inc.), Adv. Proc. 14-05008 (Bankr. D. Conn.); Cyganowski v. Long Term Care Services, Inc. (In re Mill River Foundation, Inc.), Adv. Proc. 14-05009 (Bankr. D. Conn.); Cyganowski v. Timberlake Nursing Center (In re Mill River Foundation, Inc.), Adv. Proc. 14-05010 (Bankr. D. Conn.).

[22] See Memorandum of Law in Support of Motion for the Entry of an Order (I) Appointing an Interim Receiver; (II) Granting Injunctive Relief; (III) Setting the Amount of the Receiver's

### 4.      The Salem-Reform Receivership

On May 5, 2011, the Bank of New York Mellon, as Indenture Trustee, sued Mittleider Entity Salem Nursing & Rehab Center of Reform, Inc. ("Salem-Reform") and AltaCare, seeking a receivership over Salem-Reform, injunctive relief, money owed, and an accounting. See Bank of New York Mellon Trust Company, N.A., as Indenture Trustee v. Salem Nursing & Rehab Center of Reform, Inc., AltaCare Corporation, et al., Case No. 11-01509 (N.D. Ala.). Once again, a plaintiff in litigation with Mittleider filed a motion to compel discovery [Dkt. No. 38] and, once again, a trial court compelled the discovery and awarded fees [Dkt. No. 48].

On March 18, 2014, the district court granted summary judgment to the plaintiff on liability, entitlement to an accounting, and entitlement to a receiver.  The court simultaneously appointed a receiver for Salem-Reform [Dkt. Nos. 56 and 57]. Two months into the receivership, the receiver filed an Emergency Motion to Compel [Dkt. No. 62] because Mittleider, acting through AltaCare, attempted to sell assets of the receivership estate in violation of the receivership order.[23] The district court granted the receiver's motion on June 2, 2014 [Dkt. No. 67].

In December 2014, Mittleider Entities filed proofs of claim against the receivership estate totaling $1,087,509.50, including an administrative expense claim filed by AltaCare for $130,875.00. The receiver disputed those claims and asserted causes of action against the Mittleider Entities arising out of the operation of Salem-Reform. The parties appear to have

---

Bond; and (IV) Setting a Final Hearing on the Merits for the Appointment of the Receiver [Dkt. No. 7].

[23] The Emergency Motion to Compel, at ¶ 11, noted: "The Receiver has been very clear on multiple occasions, including at the outset of the Receivership, that the Defendants have no right to attempt to sell the assets of the Receivership Estate. Nonetheless, the Defendants are intent on attempting to close on the sale of estate assets, even going so far as to take possession of deposits from the purchaser for the sale of estate assets."

resolved their disputes on terms requiring the Mittleider Entities to pay a total of $700,000.00, with a $350,000.00 lump sum to be paid before September 30, 2015, monthly payments of $9,000.00 beginning October 31, 2015, and a balloon payment for remaining amounts due to be paid on May 31, 2016. See Receiver's Motion for Order (I) Approving Compromise and (II) Granting Related Relief (Dkt. No. 108, July 23, 2015).

### 5.    The Salem Housing Corporation Bankruptcies

Salem Housing Corporation  ("SHC")  is a Mittleider Entity that owned and operated Salem Nursing & Rehab Center of Jasper, Inc. ("Salem-Jasper"), also under AltaCare's management.  SHC filed a Chapter 11 case on December 18, 1998 in the Southern District of Georgia. See In re Salem Housing Corporation, Case No. 98-13450 (S.D. Ga.). Judge Dalis confirmed SHC's plan of reorganization on March 27, 2001 [Dkt. No. 262], and the case was closed on August 30, 2002 [Dkt. No. 315].

SHC filed a second Chapter 11 case on October 14, 2005 in the Northern District of Georgia. See In re Salem Housing Corporation, Case No. 05-44617 (N.D. Ga.).  Judge Diehl confirmed SHC's Chapter 11 plan on February 21, 2007 [Dkt. No. 135], later approving a modification on August 29, 2008 [Dkt. No. 168].

On September 1, 2009, SHC filed a Motion to Dismiss for Failure to Successfully Consummate Plan. In that motion, SHC stated it would "not oppose the appointment of a receiver following dismissal," specifically acknowledging the right of the Bank of New York Mellon Trust Company, N.A., as indenture trustee (the "Indenture Trustee"), to have a receiver appointed.[24] The case was dismissed with prejudice [Dkt. No. 196] on September 9, 2010.

On March 28, 2014, the Indenture Trustee filed a complaint in the Northern District of Georgia against SHC and AltaCare for appointment of a receiver, breach of contract, injunctive

---

[24] Motion to Dismiss for Failure to Successfully Consummate Plan, ¶ 9.

relief, and an accounting. See  Bank of New York Mellon Trust Co., N.A., as Indenture Trustee

v. Salem Housing Corp. and AltaCare Corp., Case No. 14-00064 (N.D. Ga.). The district court

entered an order granting temporary injunctive relief [Dkt. No. 8], based in part on Mittleider's

history of diverting funds away from nursing homes and of running nursing homes into the

ground:

> The Indenture Trustee has shown that … absent entry of a temporary restraining
> order, it is likely that such assets will be disposed of, wasted, squandered or
> otherwise devalued or removed from this Court's jurisdiction. In point of fact, the
> combination of the Reform Litigation and Hyperion Litigation demonstrates that
> **the Defendants and their affiliates are (or at least were) engaged in a pattern
> of diverting funds from nursing homes to be used for other, entirely
> unrelated purposes.** … Specifically, in prior instances, an affiliate of SHC and
> AltaCare permitted a nursing home similar to the Nursing Homes in this case, to
> devolve into a state of disrepair resulting in the loss of their provider agreements
> and licensure, leading to the cessation of the nursing home's operations (and
> ability to operate). In another instance, AltaCare or an affiliate of AltaCare simply
> abandoned the nursing homes leaving them to the State of Connecticut, after
> which the State of Connecticut found that the residents of those nursing homes
> were left at significant risk due to staff shortages, incidents of patient abuse and
> neglect, safety code violations and broken equipment.

Id. (emphasis added) (copy attached as **Exhibit 19**).

Judge Diehl approved appointment of a Chapter 11 trustee on June 24, 2014 [Dkt. No.

234].  The Chapter 11 trustee promptly filed a motion seeking turnover of estate property and

sanctions against Mittleider and AltaCare [Dkt. No. 248] (the "Turnover Motion") and a separate

motion alleging that Mittleider violated of the automatic stay [Dkt. No. 249] (the "Automatic

Stay Motion").

The Turnover Motion alleged, in part, that Mittleider and AltaCare had "continuously

frustrated the Chapter 11 Trustee's attempts to obtain essential property of the Estate, including

material books and records, and ha[d] affirmatively prevented a smooth transition of control of

the Debtor's assets and operation." See Turnover Motion, ¶ 8. The Automatic Stay Motion

alleged, in part, that after the Chapter 11 Trustee had been appointed, Mittleider caused the unauthorized transfer of $83,841.79 in funds from the estate's bank account to third parties, including AltaCare and other Mittleider Entities; that Mittleider and AltaCare had cancelled various insurance policies covering the nursing home and employees; and that AltaCare was overbilling the estate for services. See Automatic Stay Motion ¶¶ 7, 11, 13. Those motions were withdrawn on September 4, 2014, without prejudice [Dkt. No. 277].

On September 23, 2014, the Chapter 11 trustee moved to reject SHC's management contract with AltaCare [Dkt. No. 283], stating in relevant part:

> The Chapter 11 Trustee has been undergoing a comprehensive review of the Debtor's executory contracts to determine which contracts to assume and which to reject. However, due to the recalcitrance of AltaCare to turn over the Debtor's books and records, and numerous omissions and gaps in the information and books and records provided, the Chapter 11 Trustee is unable to determine at this time whether the AltaCare Management Agreement is an executory contract or even was in force on the Reopening Date.

Id.

AltaCare opposed the motion [Dkt. No. 292]. Judge Diehl granted the motion by order entered October 24, 2014. [Dkt. No. 299].

On October 9, 2014, AltaCare moved for immediate payment of its $105,000 administrative expense claim [Dkt. No. 293] in the SHI case. Not surprisingly, the Chapter 11 trustee objected [Dkt. No. 336], noting that AltaCare's "gross mismanagement" caused significant liquidity issues for the bankruptcy estate. The Indenture Trustee filed a joinder to the trustee's response [Dkt. No. 337], noting that the IRS's proof of claim for $1.3 million indicated AltaCare withheld payroll taxes from SHC's employees but yet failed to remit the withholdings to the IRS. AltaCare withdrew its motion on January 7, 2015 [Dkt. No. 346].

On February 6, 2015, Mittleider filed 23 proofs of claim on behalf of 23 Mittleider Entities, including HP/Superior.[25] The face value of the claims total over $2 million in "services provided," providing both (i) a glimpse of the amount of money Mittleider may have siphoned from SHC had he not been displaced by the Chapter 11 trustee, and (ii) an implicit acknowledgment that Mittleider's books are brimming with intercompany "debt."

On April 15, 2015, the SHI trustee filed a 175-page Omnibus Motion for Rule 2004 Examination and for the Production of Documents [Dkt. No. 368] directed to Mittleider and the Mittleider Entities for whom he filed proofs of claim. In the motion, the SHI trustee notes at Footnote 1:

> The Chapter 11 Trustee is aware of HP/Superior's chapter 11 bankruptcy case pending before this very Court. **The Chapter 11 Trustee is particularly interested in conducting a Rule 2004 Examination of HP/Superior to understand why a nursing home controlled by Mittleider, which also happens to be in bankruptcy, would hold an alleged claim against the Estate** and whether the Estate holds a reciprocal claim against HP/Superior.

Id. (emphasis added).

### F.      HP/Superior and SHI

Turning to the cases at hand, HP/Superior filed bankruptcy on November 3, 2014, and SHI joined HP/Superior in bankruptcy on January 6, 2015. The two cases have been jointly administered under HP/Superior's case number since February 3, 2015.

As the Court is aware, HP/Superior operates the St. Francis Home in the Park nursing home facility in Superior, Wisconsin; SHI owns the real property on which the facility is located.

---

[25] Mittleider neglected to schedule a claim against SHI among HP/Superior's assets in this case. See Dkt. No. 35 (HP/Superior's statements and schedules). If the claim is among the receivables on Schedule B, he has made no mention of the claim in the 341 meeting or otherwise.

The two entities "are affiliates as that term is defined" by the Bankruptcy Code. See, e.g., Dkt. No. 49 at ¶ 4. Mittleider is the CEO, CFO, and secretary of both entities.[26]

Mittleider operated HP/Superior and SHI as he has historically operated his other facilities: by diverting funds to insiders and affiliates;[27] by diverting millions in state and federal withholding taxes; and by breaching contracts in astonishing levels of bad faith — resulting in entities that are insolvent, judgment proof, and bankrupt. Examples of Mittleider's gross mismanagement, dishonesty, and fraud are discussed below.

### 1.    HP/Superior's Pre-petition Breach of Lock Box Agreement

Pursuant to a Lock Box Agreement entered into simultaneously with the agreements underlying CSE's claims against HP/Superior, a post office box (or "Lock Box") was established solely to receive payments from Medicare, Medicaid, and other governmental programs, and those payments were to be deposited in a HP/Superior bank account created solely to receive the payments ("Lock Box Account"). The payments in the Lock Box Account were then to be wire transferred directly to CSE. In or around September 2010, Mittleider caused HP/Superior to unilaterally terminate the Lock Box and Lock Box Account. The payments were thereafter deposited to accounts not subject to the Lock Box Agreement and out of the reach of CSE.  The diversion of these funds constitutes a misappropriation of CSE's collateral proceeds.

### 2.    SHI's Control over HP/Superior Bank Accounts

Mittleider caused the funds formerly deposited into the Lock Box Account to be deposited in accounts under SHI's control. SHI's Schedule B lists three items of personal property. One is a combined $2,680,050 in accrued rent and accounts payable owed by

---

[26] **Exhibit 20** of this motion contains printouts from the Georgia Secretary of State's website listing the current officers of both entities.

[27] As further described below, the debtors' own filings in these bankruptcy cases establish avoidable and fraudulent transfers.

HP/Superior.  The other two are bank accounts, each designated as a  "[m]ere conduit for Medicaid payments to HP/Superior, Inc." In other words, HP/Superior violated the Lock Box Agreement through the use of an SHI account. This is an obvious attempt to conceal the funds.

Moreover, it is implausible to CSE that Medicaid payments are sent directly to SHI, who to the outside world is merely HP/Superior's landlord. HP/Superior is the provider on file with the Centers for Medicare & Medicaid Services ("CMS") as to this facility.[28] Payments should be sent directly to the provider.  But even assuming the CMS will send payments directly to a non-provider, no legitimate justification exists for having the payments sent to the provider's landlord.

These accounts perfectly illustrate Mittleider's where's-the-money shell game. Under the Lock Box Agreement—an agreement with HP/Superior and not SHI—Medicaid payments were deposited in or wired to a bank account belonging to HP/Superior. No "conduit" to HP/Superior was ever needed. However, payments to the Lock Box Account were automatically accessible to CSE (to pay the revolver), which made it more difficult for Mittleider to divert the money elsewhere. Moreover, given that HP/Superior owes SHI over $2.6 million in rent—based on a lease agreement over which Mittleider has total control—Mittleider can have the payments "belong" to whichever entity he wants. The money in SHI's accounts can be rent paid by HP/Superior one day and "conduit" payments to HP/Superior the next. This which-assets-belong-to-which-entities blurriness is a hallmark of Mittleider Entities and their intercompany agreements and transfers.

---

[28] **Exhibit 21** is the information on file with the CMS for this facility, as obtained from the CMS's National Plan & Provider Enumeration System.

### 3. Amendment of Lease that Effectively Eliminates HP/Superior's Obligation to Pay Rent to SHI

SHI's rights to the rent from HP/Superior SHI are subject to an Assignment of Leases and Rents ("Assignment") that assigned "all of [SHI's] right, title and interest" in the lease agreement and rents to CSE's predecessor. The Assignment requires CSE's approval before modification of the lease.

Mittleider caused SHI and HP/Superior to amend the lease—without notice or approval—to effectively eliminate HP/Superior's obligation to pay rent each month. The rent continued to accrue monthly from January 2011 but became payable only if HP/Superior generated positive net operating income.  According to Mittleider, HP/Superior never generated positive net operating income after the amendment's purported effective date.

The lease amendment—attached hereto as **Exhibit 22**—is undated, unsigned, and purports to be effective as of January 1, 2011. Mittleider failed to notify anyone about this amendment until December 2014, and the amendment was disclosed only after weeks of stonewalling SHI's receiver in Wisconsin.

### 4. Receivership Proceedings

Prior to this bankruptcy case, HP/Superior and SHI defaulted on their pre-petition obligations to CSE, and CSE filed complaints in the Circuit Court of Douglas County, Wisconsin to place HP/Superior and SHI in receiverships (collectively, the "Wisconsin Receivership Actions").  In the Wisconsin Receivership Actions, CSE filed an Ex Parte Motion for a Temporary Injunction/Temporary Restraining Order, both of which were granted and orders entered on October 23, 2014 and October 28, 2014.

On October 29, 2014, CSE filed a Motion for Joint Administration of the Wisconsin Receivership Actions. On November 3, 2014, HP/Superior commenced this case by filing its

Chapter 11 petition in this Court. HP/Superior filed the petition when it became clear receivership orders were imminent. Indeed, on November 5, 2014, the Circuit Court of Douglas County appointed a receiver over SHI. A copy of the Order Appointing Receiver is attached to this motion as **Exhibit 23**.

Mittleider refused to comply with the receivership order and refused to cooperate with the receiver. Mittleider refused to transfer over or grant access to information regarding SHI's assets, liabilities, books, or records. After two months of literally being ignored, the receiver filed a Motion to Compel Superior Healthcare Investors, Inc., and AltaCare Corporation to Turn Over Business Records on January 6, 2015, a copy of which is attached as **Exhibit 24**.[29] That same day, on January 6, 2015, Mittleider caused SHI to file a Chapter 11 petition in this Court.

### 5.      Failure to Pay Taxes Withheld From Employee Paychecks

The Claims Register in this case includes the following claims:

- $3,608,542.86 for federal withholding taxes, filed by the Internal Revenue Service (Claim 1-4);
- $42,573.07 for state withholding taxes, filed by the Minnesota Department of Revenue (Claim 8-1);
- $370,588.92 for state withholding taxes, filed by the Wisconsin Department of Revenue (Claim 9-2);
- $1,173,783.24 for withheld unemployment insurance taxes, filed by the Wisconsin Department of Workforce Development (Claim 15-1);
- $38,060.61 for *post-petition* federal withholding taxes, filed by the Internal Revenue Service (Claim 16-1); and
- $49,992.08 for *post-petition* federal withholding taxes, filed by the Internal Revenue Service (Claim 19-1).

---

[29] The receiver's request to HP/Superior for information on rent HP/Superior owed to SHI was met with the undated, unsigned lease amendment referred to above, purporting to be effective as of January 1, 2011.

6.    **Pre-petition Transfers to Other Mittleider Entities and to Related Entities**

HP/Superior's Statement of Financial Affairs [Dkt. No. 35] contains an attachment labeled "Accounts Payable" itemizing disbursements made between August 1, 2014, and November 1, 2014. The following is a list of notable entries:

### *Three Transfers in October 2014 Totaling $52,647.00 to "Amara Healthcare"*

In the month before HP/Superior filed its Chapter 11 petition, HP/Superior made three payments totaling $52,647.00 to Amara Healthcare.[30] Per the CMS, Amara Healthcare is a trade name of Salem Nursing & Rehab Center of Augusta, Inc. ("Salem-Augusta"), a skilled nursing facility located in Augusta, Georgia. Mittleider is Salem-Augusta's president, CEO, CFO, and secretary.[31] Mittleider, in his capacity as president, uses an "@altacareco.com" e-mail address, per the Secretary of State.

Aside from the undisclosed nature of these eve-of-bankruptcy transfers to another entity that Mittleider controls, the transfers are questionable by virtue of going from a Wisconsin skilled nursing facility to an ostensibly unrelated Georgia skilled nursing facility. The Georgia facility has no legitimate services it could have rendered to a Wisconsin facility.[32]

Salem-Augusta was the subject of a recent televised and online news story due to the company's failure to pay insurance premiums—leading to a lapse of employees' insurance

---

[30] The payments are as follows: $16,500.00 on October 1; $17,897.00 on October 15; and $18,250.00 on October 29.

[31] **Exhibit 25** of this motion is the information on file with the CMS for this facility, as obtained from CMS's National Plan & Provider Enumeration System. **Exhibit 26** is a copy of the most recent annual registration filed with the Georgia Secretary of State for this entity.

[32] CSE notes that a search for "Salem Nursing" in the online corporate records for the state of Wisconsin yielded no search results, indicating Salem-Augusta may not even be registered to do business as a foreign corporation in Wisconsin.

without notice.  **Exhibit 27** is an article published June 24, 2015, and titled "Employees Claim Augusta Nursing Home Failed at Providing Health Insurance, Despite Paying Premiums."[33] The employee interviewed in the news story discovered she lacked insurance only after the former insurer told her, while she was in the middle of medical treatments.

### *Two Transfers in October 2014 Totaling $30,950 to "Cambridge House"*

In the month before HP/Superior filed its Chapter 11 petition, HP/Superior made two payments totaling $30,950.00 to Cambridge House.[34] Per the CMS, Cambridge House is a trade name of HP/Cambridge House, Inc. ("HP/Cambridge").  Mittleider is listed as the president of HP/Cambridge with the CMS, and he is listed as the CEO, CFO, and secretary with the Georgia Secretary of State.[35]

Cambridge House is a skilled nursing facility located in Bristol, Tennessee. The principal address on file with the Georgia Secretary of State is the same street address listed in HP/Superior's Voluntary Petition (5174 McGinnis Ferry Road, Suite 195, Alpharetta, Georgia). As with the transfers to Amara Health care, these undisclosed transfers are questionable on their face as being made to an ostensibly unrelated facility engaged in the same business in another state.[36]

---

[33] Renetta DuBose, *Employees Claim Augusta Nursing Home Failed at Providing Health Insurance, Despite Paying Premiums*, WJBF News Channel 6 (June 24, 2015), http://wjbf.com/2015/06/24/employees-claim-augusta-nursing-home-failed-at-providing-health-insurance-despite-paying-premiums.

[34] The payments are as follows: $18,200.00 on October 8; and $12,750.00 on October 23.

[35] **Exhibit 28** of this motion  is a copy of the most recent annual registration filed with the Georgia Secretary of State.

[36] HP/Cambridge is listed as a Georgia corporation with the Tennessee Secretary of State. However, HP/Cambridge's ability to do business in Tennessee was administratively revoked in 2012.  See **Exhibit 29**, a printout from the Tennessee Secretary of State's website showing the current information on file for HP/Cambridge.

This is not the first time Mittleider has been caught transferring a bankruptcy debtor's assets to this particular Mittleider Entity.  As discussed above, Cambridge House was sued by the Mill River Chapter 7 trustee *just last year* for recovery of pre-petition transfers from Mill River.[37] That lawsuit was one of three lawsuits filed by the trustee against Mittleider Entities.[38] Settlements from those lawsuits brought in $311,615 for the estate. The settlement agreements were all hand-signed by Mittleider.[39]

### *Payments to Long Term Care Services Within a Year of Petition Date Totaling $204,261.92; and Payments to AltaCare Within a Year of Petition Date Totaling $131,075.00*

HP/Superior's Statement of Financial Affairs No. 3.c (payments to insiders) states that within a year of the petition date, HP/Superior made payments totaling $204,261.92 to Mittleider Entity LTCS, and payments totaling $131,075.00 to AltaCare.  Mittleider is the CEO, CFO, and secretary of both entities, and the principal address for both entities is 5895 Windward Parkway, Suite 200, Alpharetta, Georgia.[40]  According to HP/Superior, AltaCare manages the St. Francis facility; perhaps the payments to AltaCare were deemed management fees.  Even assuming the

---

[37] See Cyganowski v. Cambridge House (*In re* Mill River Foundation, Inc.), Adv. Proc. 14-05008 (Bankr. D. Conn Feb. 12, 2014).

[38] See also Cyganowski v. Long Term Care Services, Inc. (*In re* Mill River Foundation, Inc.), Adv. Proc. 14-05009 (Bankr. D. Conn Feb. 12, 2014), Cyganowski v. Timberlake Nursing Center (*In re* Mill River Foundation, Inc.), Adv. Proc. 14-05010 (Bankr. D. Conn Feb. 12, 2014).

[39] **Exhibits 30, 31,** and **32** are (respectively): (1) the order approving settlement in the Cambridge House adversary proceeding, with the settlement agreement signed by Mittleider attached; (2) the order approving settlement in the Long Term Care Services adversary proceeding, with the settlement agreement signed by Mittleider attached; and (3) and the order approving settlement in the Timberlake Nursing Home adversary proceeding, with the settlement agreement signed by Mittleider attached.

[40] **Exhibits 33** and **34** are (respectively) the most recent annual registrations filed for AltaCare and LTCS.

payments were made pursuant to a valid management agreement, the payments appear to be avoidable either as preferences or as constructively fraudulent.

LTCS's relation to HP/Superior is unclear—aside from the fact that Mittleider controls both.  It is also unclear why HP/Superior transferred $204,261.92 to LTCS in the year preceding the petition date.  Mittleider made vague references to undocumented "advances" he caused HP/Superior to repay to some Mittleider Entities during the 341 meeting of HP/Superior.  CSE has not yet been given the opportunity to proceed with its subpoena to LTCS, which is the subject of CSE's pending motion to compel to LTCS and certain other Mittleider Entities [Dkt. No. 57].

As noted above, a Chapter 11 trustee was appointed in the Mill River case, in part, because funds were improperly transferred to LTCS and AltaCare. For the same reasons, the Mill River case was later converted to a Chapter 7 case, and a settlement of the Chapter 7 trustee's subsequent adversary proceeding against LTCS settled with a $275,000 payment to the estate.

### *Twelve Payments totaling $184,310.06 to Woodland Park LTC, Rosewood LTC, Great Bend LTC, Fireside LTC, Friendship-LTC LLC*

In February 2012, Mittleider transferred operations and management of five skilled nursing facilities, located in Illinois, Texas, and Kansas, to AltaCare employees Daren Douston and Kerry Gibson.  Douston and Gibson ultimately operated and managed the facilities through Five Rivers Management, LLC ("Five Rivers"), their newly created entity. The circumstances surrounding the creation of Five Rivers and the transfer of operations and management are detailed in documents filed in a case previously discussed, Trilogy Rehab Services, LLC, v. HP/Markleysburg, Inc., Case No. 11-02105 (N.D. Ga.), including affidavits filed by Douston and

Gibson,[41] as well as transcripts of deposition testimony given by AltaCare's then-Director of Tax Marc Rosen and by Evelyn Brown,[42] who testified to being simultaneously employed by both AltaCare and by Five Rivers (as Director of Risk Management).[43]

Douston is now Five Rivers' CFO and Gibson is or was Five Rivers' COO.[44] Douston and Gibson hold the same positions with five LLCs that were each created to operate and manage a specific facility (collectively, the "Five Rivers Entities," and individually, a "Five Rivers Entity").[45] Five separate Mittleider Entities transferred operation and management of a particular facility to a particular Five Rivers Entity, through five separate Operations Transfer Agreements; each Five Rivers Entity then outsourced management its facility to Five Rivers. See Five Rivers Response at 3-8 and supporting affidavits of Douston and Gibson.

Marc Rosen and Evelyn Brown testified that Five Rivers and AltaCare share the same office space, that Five Rivers is staffed by former AltaCare employees, that Five Rivers and

---

[41] See Five Rivers Management, LLC's Response to Plaintiff's Motion to Amend the Complaint [Dkt. No. 143] ("Five Rivers Response"); Exhibit A to the Five Rivers Response [Dkt. No. 145-1], which is an Affidavit of Daren Douston; and Exhibit B to the Five Rivers Response [Dkt. No. 145-2], which is an Affidavit of Kerry Gibson.

[42] See Motion to Appoint Receiver [Dkt. No. 125]; Exhibit K to Motion to Appoint Receiver, which is the Transcript of Deposition of Evelyn L. Brown; Exhibit L to Motion to Appoint Receiver, which is the Deposition of Marc Rosen.

[43] Georgia Secretary of State's website has Evelyn Brown listed as registered agent for most, if not all, of the Mittleider Entities, including AltaCare and both debtors. The debtors' most recent annual corporate registrations were filed Julie 1, 2015, and list Evelyn Brown as the registered agent despite the fact that Evelyn Brown passed away on May 4, 2015.

[44] The Five Rivers Response was filed on December 28, 2012. Per Five Rivers' 2015 Corporate Annual Registration, attached as **Exhibit 35** of this motion, Daren Douston is still the CFO, as well as Five Rivers' registered agent. The registration is silent on Kerry Gibson.

[45] The Five Rivers Entities are Fireside-LTC, LLC ("Fireside-LTC"), Friendship-LTC, LLC ("Friendship-LTC"), Great Bend-LTC, LLC ("Great Bend-LTC"), Woodland Park-LTC, LLC ("Woodland Park-LTC), and Rosewood-LTC, LLC ("Rosewood-LTC").

AltaCare share at least one employee (Evelyn Brown), and that the facilities transferred to the Five Rivers Entities are profitable.[46] A reasonable conclusion is that the Five Rivers Entities, while nominally independent, are Mittleider's attempt to separate the wheat from the chaff—to conceal the profits earned by the more successful facilities. Mittleider Entities certainly do not appear to be wholly independent from Five Rivers and the Five Rivers Entities. AltaCare, LTCS, Five Rivers, and the Five Rivers Entities are represented by the same counsel in this bankruptcy case. See Objection to Order Granting Motion for Rule 2004 Examinations [Dkt. No. 56]. Moreover, publically available information indicates that one person (Jackie Sorrells) is the Director of Human Resources at both Five Rivers and AltaCare.[47]

Daren Douston—in his capacity as member of Five Rivers—is also HP/Superior's and SHI's accountant. The debtors admit this in their respective responses to Statements of Financial Affairs No. 19, and HP/Superior admitted the same at a December 4 hearing in this case.[48]

But even assuming the Five Rivers Entities are not merely a scheme to conceal assets, the pre-petition transfers to the Five Rivers Entities (totaling $184,310.06) are subject to avoidance. The Five Rivers Entities were created for the specific purpose of operating five specific facilities, located in Illinois, Texas, and Kansas. See Affidavit of Daren Douston (Exhibit 1 to Five Rivers Response) , ¶¶ 10, 19, 28, 34, and 41.  As with the transfers to Amara Healthcare and Cambridge House, the transfers to the Five Rivers Entities are facially illegitimate because out-of-state and

---

[46] See  Exhibits K and L to Motion to Appoint Receiver.

[47] **Exhibit 36** of this motion is Jackie Sorrells's LinkedIn.com professional profile, containing voluntarily provided information.

[48] On cross-examination, Mittleider testified that Daren Dustan "handles the accounting" for HP/Superior, as an employee of Five Rivers. See Transcript of Hearing [Dkt. No. 45] at 59:22-23.

purportedly independent skilled nursing facilities have no legitimate services to offer a Wisconsin skilled nursing facility.

Moreover, it is clear that Mittleider Entities directly benefit from transfers to the Five Rivers Entities. For example, Mittleider Entity LTC of Illinois Fireside owns the real estate on which Fireside-LTC operates a facility and leases the premise to Fireside-LTC, who "pays a monthly lease payment significantly in excess" of LTC of Illinois Fireside's mortgage. Five Rivers Response, p. 4. Mittleider Entity LTC of Illinois Friendship has an identical arrangement with Friendship-LTC, who operates a facility on real estate owned by LTC of Illinois Friendship. Id. at 5-6. For all five facilities, Mittleider Entities are parties to contracts under which the Mittleider Entities receive payments from the Five Rivers Facilities. See id. at 3-8.

### 7.    Post-Petition Transfers and Activities, as Established by the Debtors' Own Operating Reports

The debtors have not timely filed operating reports in this case.  Indeed, the first operating report was due by December 20 and was not filed until March 13.  See Dkt. No. 80. The February operating report was not filed until April 20, 2015. See Dkt. No. 86. The March, April, May, June, and July operating reports were not filed until Monday, August 31, 2015, see Dkts. No. 102-106, one business day after CSE's counsel informed the debtors' counsel that this motion was forthcoming.

Additionally, the debtors' Operating Reports establish that Mittleider has transferred hundreds of thousands of dollars to Mittleider Entities and related entities without Court approval and without any possible legitimate reason. The Operating Reports are also internally inconsistent, bear hallmarks of fraud, and establish (at the very least) gross mismanagement.

*Twenty-five Payments to AltaCare totaling $150,918*

**Exhibit 37** is a spreadsheet itemizing twenty-five post-petition payments to AltaCare totaling $150,918, with references to the relevant Operating Report and Operating Report page number where the payments appear. There is no innocent explanation for these payments. They cannot possibly be repayment of the court-approved post-petition loan from AltaCare. Not one of the three orders allowing HP/Superior to borrow money from AltaCare authorized repayment of the loans. Even assuming HP/Superior was authorized to repay the loan, the authorization would be beside the point—the July Operating Report [Dkt. No. 106] at page 3 states that AltaCare had loaned only $47,500 "Cumulative Petition to Date," which has not changed since the November Operating Report. The transfers *to* AltaCare are over three times that amount.

CSE notes that the debtors appear to misrepresent the actual amount borrowed from AltaCare. In the nine operating reports on file, the only transfer *from* AltaCare to the Debtors is a $22,500 transfer on November 14, 2014. The transfers *to* AltaCare are roughly seven times that amount.

The payments also cannot be explained, at least believably, as ignorant-therefore-innocent payment of post-petition management fees. All parties are aware that AltaCare is not to receive management fees post-petition. Mittleider had actual knowledge of this restriction. Mittleider attended the December 4, 2014 joint hearing on HP/Superior's Motion to Incur Debt and on CSE's Motion for Intra-District Transfer, at which the Court made it clear, "But no insider payments, no management fees." Transcript of Hearing [Dkt. No. 45] at 10:20.[49]

---

[49] One of the March 2015 payments from HP/Superior to AltaCare is designated in a bank statement as "March 2015 Accounting Fee." See March 2015 Operating Report at 18 [Dkt. No. 102]. The Court never approved retention of AltaCare as an accountant, and the debtors' have admitted that Five Rivers is the debtors' accountant.

Of course, AltaCare and Mittleider have already been through this <u>exact</u> scenario. In the <u>Mill River</u> bankruptcy (noted above in section II.E.2), AltaCare loaned the debtor $50,000 shortly after the petition date so that the debtor could make payroll. The debtor thereafter received *nunc pro tunc* approval of the loan. The motion seeking approval acknowledged that the loan could not yet be repaid. Within two days of that motion, the debtor transferred $50,000 to AltaCare in repayment.

All of this is admitted in the record of the <u>Mill River</u> bankruptcy case. <u>See</u> Debtor's Objection to Motion for Expedited Hearing on Motion by Official Committee of Unsecured Creditors for the Appointment of a Chapter 11 Trustee, Dkt. 135, Case No. 12-50306 (Bankr. D. Conn., April 30, 2012).  The explanation for this post-petition transfer? "Unfortunately,  there apparently was a miscommunication within AltaCare and … AltaCare repaid itself the $50,000." <u>Id.</u>

As noted above, the pre- and post-petition transfers in the <u>Mill River</u> case resulted in the appointment of a Chapter 11 trustee, who promptly requested conversion to Chapter 7 on the basis that Mittleider's mismanagement eliminated any prospect of rehabilitation. The Chapter 7 trustee filed three adversary proceedings seeking recovery of transfers from Mittleider Entities. Settlements from those lawsuits brought in $311,615 for the estate.

Finally, the July Operating Report's summary of receipts and disbursements (pages 2-3), lists "Cumulative Petition to Date" payments to AltaCare totaling only $15,000—one-tenth of the actual amount reflected in the records. Unless the Debtors inadvertently omitted a zero, this huge disparity cannot possibly be a simple oversight.

### Seven Payments Totaling $24,457 to Five Rivers; One Payment to Five Rivers Entity Great Bend LTC

**Exhibit 38** is a spreadsheet itemizing seven post-petition payments to Five Rivers totaling $24,457, and one post-petition payment of $2,000 to Great Bend LTC, with references to the relevant Operating Report and Operating Report page number where the payments appear. The debtors have represented to the Court that Five Rivers is the company that handles their accounting. See HP/Superior's Statement of Financial Affairs [Dkt. No. 35] No. 19; SHI's Statement of Financial Affairs [No. 15-50439 Dkt. No. 13] No. 19; Transcript of Hearing [Dkt. No. 45] at 59:13-19. The Court has not approved the retention of Five Rivers, nor have the debtors even requested Court approval.

Moreover, the December Operating Report shows a $2,000 payment to Great Bend LTC. For the reasons already stated, this transfer is immediately suspect and facially illegitimate.

### Six Payments Totaling $102,500 to Mittleider Entities Salem-Augusta, The Carrington, and HP/Wichita Hill

**Exhibit 39** is a spreadsheet itemizing six post-petition payments totaling $102,500 to Mittleider Entities Salem-Augusta, The Carrington, and HP/Wichita Hill, with references to the relevant Operating Report and Operating Report page number where the payments appear. As noted above, Mittleider is the president, CEO, CFO, and secretary of Salem-Augusta. This entity received a total of $31,500 from the Debtors post-petition. Also as noted above, Salem-Augusta received $52,647.00 in pre-petition payments in October 2014. The pre-petition transfers were made to "Amara Healthcare," the trade name for Salem-Augusta.

The Carrington—the trade name of Georgia corporation HP/Carrington, Inc.—is a skilled nursing facility located in Lynchburg, Virginia. **Exhibit 40** is the information on file with the CMS for this facility, as obtained from the CMS's National Plan & Provider Enumeration

System.  **Exhibit 41** is the most recent annual registration filed with the Georgia Secretary of State for HP/Carrington, Inc. Per these exhibits, Mittleider is the president, CEO, CFO, and secretary of this entity. The Carrington received a total of $33,500 from HP/Superior post-petition.

HP/Wichita Hill, Inc. is a Georgia corporation doing business as College Hill Nursing and Rehab Center a skilled nursing facility located in Wichita, Kansas.  **Exhibit 42** is the information on file with the CMS for this facility, as obtained from the CMS's National Plan & Provider Enumeration System.  **Exhibit 43** is the most recent annual registration filed with the Georgia Secretary of State for HP/Wichita Hill, Inc. Per these exhibits, Mittleider is the president, CEO, CFO, and secretary of this entity.  HP/Wichita Hill received a total of $37,500 from HP/Superior post-petition.

Mittleider is the president, CEO, CFO, and secretary of all three entities, and Mittleider uses the same "@altacareco.com" e-mail address in his capacity as president of each entity, per the Secretary of State.  Transfers of money from a Wisconsin skilled nursing facility to skilled nursing facilities in other states are facially illegitimate, and clearly unable to be adequately explained with any believability, given Mittleider's history.

### Four Payments Totaling $10,790 to Carl Ratcliffe

In April, May, and June 2015, HP/Superior made four payments totaling $10,790 to Carl Ratcliffe. See April Operating Report at 18; May Operating Report at 14; June Operating Report at 14, 16.  When a CSE representative visited HP/Superior's corporate offices in December 2014, the CSE representative observed a desk and name plate for Carl Ratcliffe. Moreover, per bankruptcy court records, a Carl Ratcliffe was employed by AltaCare as a "tax manager" as of

July 2008.  **Exhibit  44** are the Schedule I and payment advices filed in Chapter 13 Case No. 08-09945 in the U.S. Bankruptcy Court for the N.D. of Georgia.

Assuming Carl Ratcliffe is still an AltaCare employee, these transfers are illegitimate for the same reasons the transfers to AltaCare are illegitimate, plus the additional reason that HP/Superior should not be funding AltaCare's payroll expenses. Even assuming Carl Ratcliffe has not been employed by AltaCare since April 2015, the transfers are illegitimate because they were made to a tax professional whose retention was not approved by the Court.

Finally, the July Operating Report, at page 3, lists "Cumulative Petition to Date" payments to Carl Ratcliffe totaling $2,800, suggesting HP/Superior is attempting to conceal or downplay payments to Mr. Ratcliffe.

### *Discrepancies in Operating Reports*

HP/Superior's operating reports also reveal: (i) a net variance of $207,288 between the cash received per the "Billing Journal Summary" and cash received per the Schedule of Receipts and Disbursements; (ii) irreconcilable differences between the summaries of cash disbursements and the bank statements themselves; (iii) numerous transfers of funds (totaling $540,477) into payroll and operating accounts from unknown sources, explained in the bank account statements as being made "per Doug Mittleider," "per Jen Rose," or "per Kelly D,"  with some transfers being designated as accounts receivable deposits and some not; and (iv) an April payment of $10,500 *from* Salem-Augusta to the Debtors' payroll account.[50]

Meanwhile, the lawsuits and judgments against Mittleider Entities continue to accumulate. Senior Med Services, Inc. obtained a judgment against AltaCare for $125,000

---

[50] Shortly after this transfer, Salem-Augusta became the subject of a news report explaining that it had stopped paying employee health insurance premiums. Moreover, AltaCare is supposed to be the source of any funds borrowed to make payroll, and the operating reports show that AltaCare has transferred only $22,500 of the $200,000 borrowing limit.

shortly before HP/Superior filed bankruptcy. On April 27, 2015, this judgment creditor filed a petition in Fulton County State Court to domesticate that judgment.[51]

On May 22, 2015, TwinMed, LLC, obtained a consent judgment of $100,000 against AltaCare in Fulton County. A Fi. Fa. was issued June 22, 2015.

Numerous other involuntary liens and writs of execution have been recorded *in 2015 alone* against Mittleider and certain Mittleider Entities, including at least one Unemployment Contribution Fi. Fa. for assessments against AltaCare and a Writ of Execution issued by the U.S. District Court for the N.D. of Georgia for a judgment of over $850,000 recorded in Fulton and Cobb Counties.[52]

Moreover, Mittleider continues to conceal assets and cause his entities to ignore discovery requests directed at unraveling his entities' financials. In connection with the consent judgment noted above, TwinMed attempted to garnish an AltaCare bank account at First Citizens Bank & Trust Company, but AltaCare had already closed the account. The bank answered the garnishment on August 3, 2015, saying "Account is closed."[53]

AltaCare's failure to comply with discovery obligations in a pending Southern District of Texas qui tam action prompted a Motion to Compel Response to Subpoena Duces Tecum, filed in the Northern District of Georgia pursuant to Federal Rule of Civil Procedure 45. (Dkt. No. 1, Case No. 15-mi-00018, March 5, 2015). In that motion, AltaCare is alleged to be a potential

---

[51] **Exhibit 45** of this motion is a copy of the petition, with the judgment included among the exhibits.

[52] **Exhibit 46** of this motion contains copies of the Unemployment Contribution Fi. Fa., the $100,000 Writ of Fieri Facias, the $850,000 Writ of Execution recorded in Fulton and Cobb Counties, as well as several other documents recorded in 2015 alone evidencing judgments and involuntary liens.

[53] **Exhibit 47** of this motion is a copy of the garnishee bank's answer as filed in the State Court of Fulton County.

beneficiary of a fraudulent kickback scheme perpetrated by a company named Omnicare, Inc. In

January 2015, the relator in the qui tam action[54] served a Subpoena Duces Tecum on AltaCare to

determine whether and to what extent AltaCare was a beneficiary of the scheme.  Per the Motion

to Compel Response, AltaCare ignored the subpoena.

## III.    LEGAL ARGUMENT

CSE seeks the appointment of a trustee under 11 U.S.C. § 1104(a) or conversion to

Chapter 7 under 11 U.S.C. § 1112(b)(1).  Section 1104(a) provides:

> (a) At any time after the commencement of the case but before confirmation of a
> plan, on request of a party in interest or the United States trustee, and after notice
> and a hearing, the court shall order the appointment of a trustee—

>> (1) for cause, including fraud, dishonesty, incompetence, or gross
>> mismanagement of the affairs of the debtor by current management, either
>> before or after the commencement of the case, or similar cause, but not
>> including the number of holders of securities of the debtor or the amount
>> of assets or liabilities of the debtor; or

>> (2) if such appointment is in the interests of creditors, any equity security
>> holders, and other interests of the estate, without regard to the number of
>> holders of securities of the debtor or the amount of assets or liabilities of
>> the debtor.

Id. Section 1112(b)(1) provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in
> interest, and after notice and a hearing, the court shall convert a case under this
> chapter to a case under chapter 7 or dismiss a case under this chapter, whichever
> is in the best interests of creditors and the estate, for cause unless the court
> determines that the appointment under section 1104(a) of a trustee or an examiner
> is in the best interests of creditors and the estate.

Id.

The standard for appointment of a Chapter 11 trustee or conversion to Chapter 7 is

preponderance of the evidence.  See, e.g., Keeley & Grabanski Land P'ship v. Keeley (In re

Keeley & Grabanski Land P'ship, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011) ("[T]he proper

---

[54] The qui tam action is Case No. 4:08-cv-03396 in the U.S. District Court for the S.D. of Texas.

standard for a party seeking the appointment of a Chapter 11 trustee is preponderance of the evidence."); Synovus Bank v. Brooks (*In re* Brooks), 448 B.R. 483, 489 (Bankr. N.D. Ga. 2013) (Drake, J.) ("In assessing a motion made under Section 1112(b), the movant bears the burden of establishing cause by a preponderance of the evidence.") (internal quotation marks omitted); see also Grogan v. Garner, 498 U.S. 279, 286-91 (1991) (explaining that preponderance of the evidence standard should be used in civil actions between private litigants unless particularly important individual interests or rights are at stake, and concluding that the preponderance standard applies to discharge exceptions).

### A.    "Cause" Under § 1104(a)(1) and § 1112(b)(1), (b)(4)

Section 1104(a)(1) specifically lists "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case" as several non-exclusive examples of "cause."  Other factors affecting a court's decision to appoint a Chapter 11 trustee include: (1) Materiality of the misconduct; (2) Evenhandedness or lack of same in dealings with insiders or affiliated entities *vis-a-vis* other creditors or customers; (3) The existence of pre-petition voidable preferences or fraudulent transfers; (4) Unwillingness or inability of management to pursue estate causes of action; (5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and (6) Self-dealing by management or waste or squandering of corporate assets.  Crescive Landscape Mgmt., Inc. v. PHDC, LLC (*In re* PHDC, LLC), No. 03-93397, 2004 WL 5846712, at *3 (Bankr. N.D. Ga. Apr. 28, 2004) (Bihary, J.) (citing *In re* Intercat, Inc., 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000) (Davis, J.).

In Crescive Landscape Mgmt., Judge Bihary held:

The appointment of a trustee under § 1104(a)(1) is appropriate where the debtor has diverted funds or failed to explain the diversion of funds.  A history of transactions between the debtor and related companies can also serve as cause for

43

> the appointment of a trustee under § 1104(a)(1), as can debtor's failure to keep
> adequate records and to make prompt and complete reports.

Id. (citations omitted) (citing In re PRS Ins. Group, Inc., 274 B.R. 381 (Bankr. D. Del.2001); In re Oklahoma Refining Co., 838 F.2d at 1136)).   There is already ample record evidence of unexplained and improper transfers.

Section 1112(b)(4) contains a non-exclusive list of examples of "cause" to convert to Chapter 7 under § 1104(b)(1). See In re Global Ship Systems, LLC, 391 B.R. 193, 202 (Bankr. S.D. Ga. 2007) (list is "not exhaustive"). The list includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," "gross mismanagement of the estate," "unexcused failure to satisfy timely any filing or reporting requirement," and "failure timely to pay taxes owed after the date of the order for relief." A Chapter 11 debtor's unwillingness or unlikelihood of pursuing estate causes of action also constitutes "cause" sufficient to convert to Chapter 7. See, e.g., In re Picacho Hills Utility Co., 518 B.R. 75, 83-84 (Bankr. D. N.M. 2014) ("Conversion will allow a neutral, unbiased trustee to administer claims and investigate transfers without incurring the administrative costs associated with a Chapter 11 proceeding."); In re Ria, LLC, No. 09-00588, 2010 WL 1418349, at *2 (Bankr.  D.D.C. 2010) ("In any event, conversion is warranted because it will ensure that an independent fiduciary, a chapter 7 trustee, is in place to pursue assets and causes of action for the benefit of the estate and creditors."); see also In re New Millennium Mgmt., LLC, No. 13-35719-H3-11, 2014 WL 792115, at *5-6 (Bankr. S.D. Tex. Feb. 25, 2014) ("It is self-dealing, and has the effect of concealing his activities from the court and creditors. Standing alone, it constitutes cause for conversion or appointment of a trustee.").

### 1.      Pre-petition Conduct

Pre-petition conduct can constitute cause to appoint a trustee. See 11 U.S.C. § 1104(a)(1) (noting that behavior "either before or after the commencement of the case" can be cause). Given Mittleider's extensive history of self-dealing, mismanagement, and litigation tactics with the other Mittleider Entities, sufficient cause existed to appoint a trustee the moment HP/Superior filed a bankruptcy petition.

Specific to these debtors, the *disclosed* transfers over a mere three months establish a combined $83,597.00 to Amara Healthcare and Cambridge House, among other Mittleider Entities. Moreover, the *disclosed* transfers over a mere three months establish a combined $184,310.06 to the Five Rivers Entities. These transfers directly or indirectly benefit Mittleider due to the Five Rivers Entities' contracts with Mittleider Entities. These, too, are entities that in all likelihood are not legitimate creditors of HP/Superior.  Given Mittleider's history, these transfers look like a siphoning of assets for the ultimate benefit of Mittleider—transferred away from insolvent entities to the Five Rivers Entities, who then turn around and pay other Mittleider Entities for the right to operate the nursing homes.

Moreover, HP/Superior admittedly transferred hundreds of thousands of dollars to insiders LTCS and AltaCare in the 12-month period before the petition date. These transfers look like more of the same—transfers for no consideration or payment of unsecured debt to insider affiliates. Even assuming a "valid" debt for services "rendered," these transfers constitute, at a minimum, clear preference for Mittleider Entities to the detriment of legitimate creditors.

### 2.      Post-petition Conduct

As noted, HP/Superior's December Operating Report establishes that HP/Superior transferred $2,000 to Great Bend-LTC—an entity (1) that operates a Kansas skilled nursing facility and cannot possibly provide legitimate goods or services to a Wisconsin skilled nursing

facility, and (2) that is contractually obliged to make payments to Mittleider Entity HP/Great Bend, Inc., rendering any payment to Great Bend-LTC to Mittleider's immediate benefit.

Moreover, the debtors are not paying withholding taxes to the IRS. On April 13, 2015, the IRS filed an administrative expense claim (Claim 19-1) for post-petition withholding taxes for November-December 2014. HP/Superior's operating reports establish that these taxes were actually withheld.

### 3.    Causes of Action Current Management Are Unlikely to Pursue

It almost goes without saying that current management will not sue itself to recover fraudulent transfers, constructively fraudulent transfers, and preferences, nor will it sue itself on an alter ego theory.  If the flurry of proofs of claim filed in the SHC bankruptcy and the Salem-Reform receivership are any indication, current management will delay the inevitable for as long as the Court allows.

### B.    Interest of Creditors and Other Interests of the Estate Under § 1104(a)(2) and § 1112(b)(1)

"Courts may also appoint a trustee under § 1104(a)(2) when it is in the best interest of creditors. Under § 1104(a)(2), the Court tries to determine whether the benefits to the estate will outweigh the costs involved in appointing a trustee." Crescive Landscape Mgmt., Inc. v. PHDC, LLC (In re PHDC, LLC), No. 03-93397, 2004 WL 5846712, at *3 (Bankr. N.D. Ga. Apr. 28, 2004) (Bihary, J.) (citing In re SunCruz Casinos, LLC, 298 B.R. 821, 829 (Bankr.S.D.Fla.2003); 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] (15th ed.2003)).  Alternatively, [p]ursuant to 11 U.S.C. § 1112(b), once 'cause' is established a chapter 11 case shall be converted, dismissed, or a chapter 11 trustee appointed whichever is in the best interests of the creditors and the estate." In re Paradise Farms, Inc., No. 12-30111, 2013 WL 1403486, at *1 (Bankr. S.D. Ga. 2013). Current management's unwillingness to pursue causes of action that will benefit the estate justifies

appointment of a Chapter 11 trustee under § 1104(a)(2) or conversion under § 1112(b). See e.g., In re Corona Care Convalescent Corp., 527 B.R. 379, 387-88 (Bankr. C.D. Cal. 2015) ("A Chapter 11 trustee may attempt to enforce this potential claim where debtors' current management has not so far, and this is further evidence that appointment of a Chapter 11 trustee is in the best interest of creditors to pursue such claim to recover value for creditors."); In re Picacho Hills Utility Co., 518 B.R. 75, 83-84 (Bankr. D. N.M. 2014) ("Conversion will allow a neutral, unbiased trustee to administer claims and investigate transfers without incurring the administrative costs associated with a Chapter 11 proceeding."); In re Ria, LLC, No. 09-00588, 2010 WL 1418349, at *2 (Bankr. D.D.C. 2010); In re New Millennium Mgmt., LLC, No. 13-35719-H3-11, 2014 WL 792115, at *5-6 (Bankr. S.D. Tex. Feb. 25, 2014).

The known causes of action against current management, including Mittleider and AltaCare, justify appointment of a Chapter 11 trustee or conversion to Chapter 7. The debtors have filed documents in this Court establishing—at a bare minimum—hundreds of thousands of dollars of preference payments to various Mittleider Entities and the Five Rivers Entities. The dollar amount of otherwise questionable transfers (that we know about) totals over $600,000.

## IV.    CONCLUSION

For the foregoing reasons, the Court should appoint a trustee for HP/Superior and SHI under 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2) or convert the cases to Chapter 7.  Accordingly, CSE requests: (i) that the Court enter an order directing the appointment of a Chapter 11 Trustee to perform the duties and responsibilities of a trustee under the Bankruptcy Code; and that the Court enter an order directing HP/Superior, SHI, and their respective managers, independent contractors, partners, agents, affiliates, servants, attorneys, officers, directors, shareholders, and employees, and all those persons acting in concert or participation with them, under their control

47

or on their behalf, directly or indirectly, to turn over possession and control of any and all estate property, to the appointed Chapter 11 Trustee; or, in the alternative, (ii) that the Court enter an order directing the immediate conversion to a case under Chapter 7; and that the Court enter an order directing HP/Superior, SHI, and their respective managers, independent contractors, partners, agents, affiliates, servants, attorneys, officers, directors, shareholders, and employees, and all those persons acting in concert or participation with them, under their control or on their behalf, directly or indirectly, to turn over possession and control of any and all estate property, to the Chapter 7 trustee; and (iii) for any and all such other relief as is justified by the facts and the law deem just and proper.

Submitted by:

*/s/ Kevin A. Stine*
Kevin A. Stine
Georgia Bar No. 682588
kstine@bakerdonelson.com

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
Suite 1600, Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, GA 30326
404.577.6000 (Telephone)
404.221.6501 (Facsimile)

Counsel for CSE Mortgage LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2015, I electronically filed the foregoing

**Motion for Appointment of Chapter 11 Trustee or, in the Alternative, for Conversion to**

**Chapter 7** with the Clerk of Court and served the same via electronic mail upon the following

CM/ECF users registered to receive filings in this case:

Ashley Reynolds Ray, Esq.           G. Frank Nason, IV, Esq.
Scroggins & Williamson, P.C.        Lamberth, Cifelli, Stokes, Ellis & Nason, P.A.
1500 Candler Building               3343 Peachtree Road, N.E.
127 Peachtree St., N.E.             East Tower, Suite 550
Atlanta, GA 30303                   Atlanta, GA 30326-1009

David S. Weidenbaum, Esq.
Office of the United States Trustee
362 Richard B. Russell Building
75 Spring Street, S.W.
Atlanta, GA 30303



Submitted by:

*/s/ Kevin A. Stine*
Kevin A. Stine
Georgia Bar No. 682588
kstine@bakerdonelson.com

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.           Counsel for CSE Mortgage LLC
Suite 1600, Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, GA 30326
404.577.6000 (Telephone)
404.221.6501 (Facsimile)